* Sedgwick, J.
There is in this case a motion for a new trial on two grounds: 1. For a misdirection of the judge who tried the cause ; and, 2. Because the verdict is against evidence.
The several questions, which give rise to the objections made by the defendants, are, 1. Was there a deviation, before the capture by the British cruiser, which discharged the underwriters ? 2. Are the underwriters discharged in consequence of the misconduct of the master ? 3. Ought a valuation of the cotton to be made by the price at which it was purchased at the Cape of Good, Hope, or by its price at the Isle of France ? I leave out of all question the partial loss, which was sustained at the Cape of Good Hope.
I shall consider the several questions respectively, in relation to the directions of the judge, and to the finding of. the jury.
There is no question as to the interest of the plaintiff. The insurance was upon the ship and cargo. The voyage insured was from Newburyport to one or more ports beyond the Cape of Good Hope, one or more times ; for the purpose of disposing of her outward cargo, and procuring a return cargo ; at and from them, or either of them, to her port of discharge in the United States ; with liberty to touch and trade, at any ports and places, on her outward and homeward passages
*394 The only place at which the ship stopped, going or returning, was the Cape of Good Hope, on her outward passage ; until, being on her direct course to the United. States, she was captured; and the only port to which she went, beyond the Cape, was the Isle of France.
After the ship, in the prosecution of her voyage, arrived at the Cape of Good Hope, she anchored in Table Bay. There, while the master, without any evidence of unnecessary delay, was preparing to proceed on his voyage, the ship, by a violent gale of wind, was driven from her moorings and stranded. In consequence of the damage * which the ship received from this accident, the cargo was taken out and landed, and the ship taken round to Seaman’s Bay. Here she was some time detained, partly in receiving necessary repairs, and partly by an embargo.
Had the removal of the ship from Table Bay to Seaman’s Bay been unnecessary or improper, it would have been a deviation, and would have discharged the underwriters. But this question was expressly left to the jury, who have found that Seaman’s Bay was a suitable place to make the repairs, and necessary to be resorted to for that purpose.
At the Cape of Good Hope, then, there was no deviation. Was there any, or what is tantamount to it, at the Isle of France 1 That question was fairly referred to the jury, and by them determined in the negative; and it only remains to be inquired whether that determination was so much against the weight of evidence as to make it proper to send the case back to the jury for reconsideration, two verdicts having been already returned the same way.
One of the termini of the voyage was a port or ports beyond the Cape of Good Hope ; to which the ship had leave to go, one or more times, for the purpose of disposing of her outward, and procuring a return cargo ; with liberty to touch and trade at any ports and places on her outward and homeward passages. Within the terms of the contract, therefore, the ship was authorized to “ touch and trade ” at the Cape, and to go to the Isle of France, and from thence to other ports beyond the Cape; or she might immediately return from thence to the United States, and in that passage stop at the Cape. But she was not authorized, by the contract, to sail from the Isle of France to the Cape, and again return to the Isle of France.
A deviation is a voluntary departure, without necessity or reasonable cause, from the regular and usual course of the voyage insured. This discharges the underwriters from the time of the deviation. And any unnecessary delay during the course of the voyage, whether at sea or in * port, is tantamount to a deviation, and followed by the same consequence. And the reason on which these principles are founded is, that it is understood. *395 as a part of the contract of insurance, that the voyage insured is to be prosecuted in the usual and ordinary route, and the business of it attended to, at least, with ordinary diligence. But an intention to deviate, however deliberately formed, is not a deviation.
A voyage from the Isle of France to the Cape of Good Hope, and back to the Isle of France, was not within the policy ; and had it been prosecuted, it would doubtless have discharged the policy. But the intention alone cannot have that effect.
From what has been said, it is evident that the only question, upon the defence set up, on the ground of deviation, is, whether there was an unnecessary delay at the Isle of France. If there was any such, whether it was occasioned by an attention to a preparation for the intended voyage, or any other cause, the under writers are discharged.
The ship arrived at the Isle of France on the 29th of February, 1806, and sailed from thence on the 25th of July in the same year; • making the stay there five months wanting five days. This delay ought to be accounted for. No account is given what was doing, which occasioned a necessary delay during the months of March and April. During that time, however, the master had made up his mind to go to the Cape, leaving behind him the Surat cotton, and that part.of his original cargo which he had with him unsold, and to return again to the Isle of France. For this voyage he was in readiness the beginning of May. A regulation of the port required a delay of forty-eight hours ; and this delay was equally necessary, whether the voyage intended was to the United States or to the Cape of Good Hope. The delay, then, during the first and second days of May, are accounted for. In this state of readiness the ship continued, with a pilot on board, and with * a permit to depart, fastened only by a single halser, until the 7th of May, waiting only for the master to come on board ; when information was received that the Cape of Good Hope was surrendered to the British. From this statement it appears that, from the 3d to the 7th of May inclusive, the ship was in readiness for her departure upon the voyage, which was insured and prosecuted, to the United States ; and her intermediate delay is not at all accounted for.
Now, it is undoubtedly true that the shortness of the time, or the distance of a deviation, makes no difference as to its effect on the contract. Whether for one hour or one month, or for one mile or one hundred miles, the consequence is the same. If it be voluntary and without necessity, it puts an end to the contract. (1)
*396 In this case, there are five full days’ delay wholly unaccounted for. It may, perhaps, be said that it might have consumed the whole of this time to have reladen the cotton, &c., if, instead of a voyage to the Cape, one to the United States had been intended Of this we have no evidence; but what is a better answer is, that the relading of the cargo afterwards was rendered necessary in order to prosecute the voyage which was afterwards undertaken to the United States; and the plaintiff cannot claim in excuse for the delay the time that might have been taken, and that which was actually taken. This would be double the necessary delay ; and no unnecessary delay can be excused.
There is certainly very slight evidence to account for the residue of the stay at the Isle of France from the 7th of May to .the 25th of July, two months and eighteen days. Nothing was purchased or sold. When the master heard of the surrender of the Cape, it seems that he made up his mind to return to the United States; and after this, more than two months and a half elapsed before his departure; and what was done, in all that time, in relatian to the * voyage ? The master endeavored ineffectually to sell his cotton, as he had done for more than two months before. He repacked and put it in order for a homeward cargo. He invoiced and put it on board. And he received on board, on freight, 146 chests of tea. This was all; and,according to my conception, it might easily have been performed in much less time (had that diligence been observed which was the duty of the master) than the two months and eighteen days, which intervened between the time when the voyage to the Cape was abandoned, and the time of the departure from the Isle of France.
I make no account, upon the question of deviation, of the taking • of the tea on board on freight; for the voyage insured was for the purpose of disposing of the outward and procuring a return cargo ; and I think it must be indifferent to the parties whether the return cargo was procured by freight or by purchase. All the question is as to the quantum of delay ; and there is no evidence showing that the former consumed more time than the latter would have done. On the whole, I am inclined to believe that the facts, relative to the length of time the ship continued at the Isle of France, afforded so much weight, that a conclusion might have been justly drawn, that there was a deviation ; but as this conclusion was a mere matter of evidence, which has been submitted to two juries, who have determined the same way, the Court is of opinion that there is not sufficient ground to set the verdict aside.
As to the misconduct of the master, whatever it might be, and however it might authorize a capture and condemnation, I do not *397 think the defendants can avail themselves of it, because it does not appear that the seizure was for that cause ; and it is clear, from the restoration of the ship, that no damage has been sustained on that account; and I think that my brother, who tried the cause, was correct in instructing the jury that, under such circumstances, the misconduct of the master did not operate to discharge the underwriters.
*-As to the valuation of the cotton, I think the rule assumed by the judge was the just one. A policy of insurance is a contract of indemnity. To render it such, as respects goods, the rule is, when they are purchased, to make an aggregate of their prime or invoice price, and all duties and expenses upon them, until they are put on board, including the premium of insurance ; and from analogy, if the goods happen not to be purchased, but are grown or produced, or the property in them otherwise obtained by the assured, then their value, or, what is the same thing, their price, at the place where the insurance commences. Now, this insurance was upon the return cargo ; but the cotton was never a part of the return cargo until it was put on board at the Isle of France ; and therefore the value must be ascertained by the price there.
It was contended, for the defendants, that the underwriters are not answerable for the value of the cotton, because, it having been originally British property, and not having been libelled, though captured and carried into port as prize, it was liable to seizure by British cruisers; and as this also was the cause of the arrest and detention of the ship, the whole misfortune, which attended the voyage from the Isle of France, is imputable to this misconduct of the master, for which the owners, and not the underwriters, are answerable.
This would be a strong point in the case, if, from the evidence, we were authorized to conclude that the cotton had not been condemned at the Cape of Good Hope, and that it had been purchased by the master, knowing that defect of title; and that it had been seized and condemned for that cause. But none of those facts appear to have been proved. It is true that there was a rumor at the Cape, that no sentence of condemnation had been passed upon the cotton ; but it does not appear that the master had ever heard it. He purchased it openly; and, as it was known to have been taken as prize, we think it ought to be presumed, until the contrary be proved, that he supposed *that the ordinary proceedings of civilized nations towards the property of their enemy when taken as prize, had taken place. Nor does it appear that the claim of the master for the cotton was *398 rejected, on the ground that it had not been formally condemned; but because it was doubtful whether it had not formerly belonged to British subjects. As, therefore, the master purchased the article innocently, and as, from the facts, it is reasonably to be presumed it had been duly condemned, at the instance of the original captors, before the purchase by the master, we think this cannot be aground for setting aside the verdict.
After the foregoing opinion had been pronounced, the counse for the defendants suggested to the Court their apprehension that some circumstances, on which they principally relied in the defence, had escaped the consideration of the Court, or had not been sufficiently urged by them in the argument; that they relied on the evidence of misconduct in the master at the Isle of France and at Bermudas, not simply as discharging the defendants from any further responsibility, but as showing that the loss in fact arose from a peril against which they did not insure. The misconduct referred to was the mixing the teas belonging to the French merchants at the Isle of France in the’same invoice and bills of lading with the cotton belonging to citizens of the United States, and his repeated attestations to the truth of the said invoices and bills of lading. This was such a violation of neutrality on the part of the master, as, by the law of nations, subjected all the property contained in such false invoices and bills of lading to condemnation The said cotton was condemned for this cause only; and this should have been considered as proved by the decree itself, until such presumption was rebutted by other evidence ; or else the depositions offered at the trial, and rejected by the judge, should have been admitted, as furnishing presumptive evidence at least. And if it be *said that all the legal evidence on this point was submitted to the jury, the defendants contend that the verdict should be set aside as being against the weight of evidence.
On the question of deviation, it was observed that it could not with correctness be said to have been twice submitted to the jury ; since, at the first trial, there being no dispute as to the facts relating to it, it was considered rather as a question of law, on which the judge instructed the jury in favor of the assured ; and as all the facts are yet undisputed, it is still either simply a question of law, or if any inference of other facts from those proved is necessary, the Court can make such inference more correctly than the jury ; and in either case, the opinion of two juries would not be permitted to overbalance that of the Court. The defendants apprehend that *399 the facts proved at the trial fully established a deviation, and if any question of fact remained for the jury to infer, it was one on which they could not doubt, if they fully understood the direction of the judge as stated in the report; there being no evidence to contradict or control that offered on the part of the defendants.
Upon these grounds, the defendants asked that the entry of the judgment might be postponed, and that they might have a further hearing on these points.
Judgment being accordingly stayed, and the action continued rin, another argument was had at the last March term in Suffolk, after which

The Court

observed that, if it was apparent that the condemnation was for the misconduct of the master, it might have followed that the underwriters would be discharged, (a) But it did not appear that the condemnation was for that cause. The false, invoices and bills of lading are not assigned as the grounds of the decree; and what furnishes a strong "presumption to the contrary is, that the vessel was restored, although, as belonging to the same owners with the cotton, it was by the rule equally liable to condemnation.

Judgment on the verdict.

 Marsh. 194.

 [Misconduct of the master will not discharge the underwriter — See Shore vs Bentall, 7 B. & Cr. 798. — Busk vs. Royal Exchange Insurance Company, 2 B. & Ald 73. — Petapsco Insurance Company vs. Coulter, 3 Peters, 222. — Ed.]